**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| JANE DOE a.k.a. BERRI A. WELLS | * | |
| | * | |
| v. | * | Civil No. CCB-20-2213 |
| | * | |
| STATE OF MARYLAND, et al. | * | |

************

# MEMORANDUM

In this matter, plaintiff Jane Doe a.k.a. Berri A. Wells ("Wells") brings discrimination, due process, breach of contract, consumer protection, and other tort claims against various federal and Maryland state entities and the Middle States Commission on Higher Education concerning her dismissal from and reinstatement to a graduate program at the University of Maryland Eastern Shore ("UMES") after she received a failing grade in her first course. Now pending are the motions to dismiss brought by the state defendants (ECF 19), the federal defendants (ECF 27), and the Middle States Commission on Higher Education (ECF 35); and Wells's motion for summary judgment and her motion to take discovery pursuant to Fed. R. Civ. P. 56(d) (ECF 39; ECF 45). These matters have been fully briefed or the parties have had an opportunity to respond and no oral argument is necessary. *See* Local Rule 105.6 (D. Md. 2021). For the following reasons, the court will grant the motions to dismiss and deny Wells's motions for summary judgment and to take discovery.

## FACTUAL BACKGROUND

In the Fall of 2018, Wells, a fifty-five-year-old African American woman, was a student in UMES's Organizational Leadership Program. (ECF 2, Compl ¶¶ 4, 9). UMES is an historically Black college. (*Id.* ¶ 3). Wells's first course, OLRD 601 – Theories and Organizations, was taught by Dr. Prince Attoh and classes were held over the month of September. (*Id.* ¶¶4, 9). There were

seven assignments for the course, including one presentation, one group project, four writing assignments, and a final exam. (*Id.*; ECF 2-5, Ex. C; ECF 2-4, Ex. B at 38). The first written assignment for the course was due by the end of the day on September 6, 2018. (ECF 2-4, Ex. B at 2). On September 6, 2018, Wells emailed Dr. Attoh to request to turn in the assignment at 9:00 a.m. the following morning, because she was occupied with looking for housing. (*Id.*). Dr. Attoh denied the request. (*Id.*). Wells attempted to email the assignment to Dr. Attoh at 9:07 p.m. on the evening of September 6, but she sent the assignment to an incorrect email address for Dr. Attoh. (*Id.* at 4). Minutes earlier, Wells had successfully emailed an assignment that appears to have been associated with the presentation assignment. (*Id.* at 5 (emailing a PDF entitled "Assignment Number One Org Chart v2"); ECF 2-5, Ex. C (describing organization chart presentation)). Dr. Attoh appears to have ultimately received part of the first writing assignment, as he emailed Wells on September 14, 2018, with an evaluation for one part of the assignment, but informed her that she had not submitted a complete assignment. (ECF 2-4, Ex. B at 8). Later that day, Wells submitted the remainder of the assignment. (*Id.* at 9). Wells received no credit for the assignment. (ECF 2, Compl. ¶ 11; ECF 2-4, Ex. B at 38).

Wells received a grade of 5/5 on the presentation assignment. (ECF 2-4, Ex. B at 38). Wells submitted an additional "reflection paper" on September 14, participated in a group project, and took a final exam, and received scores of 8/10, 19/20, and 21/25 on those assignments, respectively. (ECF 2, Compl. ¶¶ 13, 15; ECF 2-4, Ex. B at 38). For the group project, Wells was partnered with a white male student who was younger than her. (ECF 2, Compl ¶ 15). Wells received a score of 5/10 for an additional writing assignment that focused on critiquing an empirical article, because, Wells concedes, she failed to follow the rubric for the assignment Dr.

Attoh provided and because she did not select an appropriate empirical article to critique. (*Id.* ¶¶ 13, 17; ECF 2-4, Ex. B at 38; ECF 2-16, Ex. N).

Wells's final written assignment, an "argument paper," was due on September 28, 2018. (ECF 2-5, Ex. C). On October 2, 2018, Dr. Attoh notified Wells that he was grading papers and did not see an argument paper from her. (ECF 2-4, Ex. B at 35). At 11:58 a.m. the following morning, Dr. Attoh emailed Wells, asking her to call him and stating "it is c[ruc]ial that you call me today." (*Id.* at 34). Several hours later, Wells emailed Dr. Attoh to inform him that she "was not able to complete the paper" but was "working on it[.]" (*Id.* at 35). As with the earlier missed deadline, Wells's excuse for failing to turn in the assignment was related to housing—"[t]he rental that [she] decided on, fell through and [she] had to find another property[.]" (*Id.*). Dr. Attoh responded: "Please do not submit the paper. I have already calculated grades for 601. That is why I had asked you to call me. If you are available, can you call me now? . . . We need to discuss what happens next after your 601 evaluation." (*Id.* at 36). In some parts of the complaint, Wells appears to allege that she did ultimately email this final assignment to Dr. Attoh; however, she acknowledges in other attachments to her complaint that the assignment was not timely submitted. (*Id.* at 39; ECF 2-5, Ex. C at 4; ECF 2-13, Ex. K, Second Appeal, at 5).

On October 4, 2018, Dr. Attoh emailed Wells her final evaluation for the course. Largely because of her failure to timely submit two assignments, Wells received a failing grade. (ECF 2-4, Ex. B at 38). Dr. Attoh included with the evaluation a quote taken from the UMES graduate handbook: "A student who receives a final course grade of "F" at any time will be immediately dismissed from the program." (*Id.*; ECF 2-11, Ex. I, Excerpt of UMES Graduate Catalog at 3). He further indicated that the Graduate Studies Office would follow up with a formal dismissal letter and that she should drop her next courses before their start dates in order to receive a refund. (ECF

2-4, Ex. B at 38). Wells received a letter from Interim Dean LaKeisha Harris on the same day, informing her of her termination from the program. (ECF 2-3, Ex. A). Wells alleges that her grade was arbitrary because Dr. Attoh "withheld" her grade until the end of the course and did not return each graded assignment to students in a "timely" manner. (ECF 2, Compl. ¶ 10). She contends that feedback should have been given on the same day assignments were turned in. (*Id.*) Wells further alleges that the UMES grading policy is less favorable to students than the grading policies at University of Maryland University College (UMUC). (*Id.* ¶ 28; ECF 2-18, Ex. P. UMUC Syllabus). She further includes with her complaint a letter from another former student of the Organizational Leadership Program who believes Dr. Attoh to have unfairly graded her work as a "millennial" student. (ECF 2-32, Ex. CC, Settles Ltr.).

On October 9, 2018, Wells appealed her failing grade and requested to be readmitted to the Organizational Leadership Program in accordance with UMES policy. (ECF 2-8, Ex. F, Appeal; ECF 2-9, Ex. G, Appeal of Dismissal/Discontinuation Policies and Procedures). On December 4, 2018, Dean Harris sent Wells a letter advising her that "[a]fter a review of the policies and procedures for the doctoral program in Organizational Leadership," the University was rescinding her dismissal effective that day. (ECF 2-12, Ex. J, 12-4-2018 Harris Ltr.). The letter further informed Wells that she had been withdrawn from course 601 and would receive any refunds applicable. (*Id.*). Following the withdrawal, Wells's grade for course 601 was changed from an "F" to a "W." (ECF 2, Compl. ¶ 24; ECF 2-27, Ex. X, 9-28-2019 Harris Ltr.). Despite the letter rescinding her dismissal, Wells filed an additional appeal to Jason Casares, a UMES employee in the Office of Institution Equity and Compliance. (ECF 2-13, Ex. K, Second Appeal). In this second appeal, Wells wrote that she called the Office of Student Accounts on November 30, 2018, and learned that she would need to pay a balance of over $7,200 by June 2019. (*Id.*).

Wells disputes the debt UMES claims she owes before she can reenroll in the Organizational Leadership Program, which had grown to $8,986.77 by July 1, 2019. (ECF 2, Compl. ¶ 32; ECF 2-30, Ex. AA at 3). Wells has received letters and notices from UMES attempting to collect the alleged debt and her account balance has been referred to the State of Maryland Central Collection Unit ("CCU") for collection. (ECF 2, Compl. ¶¶ 45–46; ECF 2-30, Ex. AA at 3). Following Wells's continued correspondence to Dean Harris regarding her alleged debt and desire to reenroll, Dean Harris sent Wells a letter on September 18, 2019, which stated:

> Dear Ms. Wells:
>
> I have reviewed your appeal for tuition reimbursement and have spoken to the University Registrar and the Student Accounts Office. It has been determined that you are not entitled to a refund for courses that you were withdrawn from in fall 2018.
>
> In fall 2018, you were withdrawn from ORLD 601 after I reviewed the policies and procedures for that program and determined that you were dismissed in error. I sent notice to you on December 4, 2018 at which time you acknowledged receipt. In reviewing your financial account, it was determined that you were notified by the Office of Financial Aid that you were no longer eligible for financial aid because you were not enrolled in the required number of courses.
>
> As a result of you no longer being eligible for Aid, all Federal Aid paid to you had to be sent back to the Federal Government via UMES. Subsequently, you now owe UMES the balance. I was informed that notices regarding your balance had been sent to you periodically. As I stated in my Readmission letter to you on June 25, 2019, you have been granted readmission to the Organizational Leadership program and the University, however, I am unable to assist you with the payment of your prior balance.
>
> Please let me know if you have any questions.

(ECF 2-27, Ex. X, 9-18-2019 Harris, Ltr.).

Wells additionally alleges that grievance procedures at UMES are less favorable to students than procedures at other University of Maryland campuses, such as at College Park, which Wells alleges are majority white institutions. (ECF 2, Compl. ¶¶ 52–57).

On June 23, 2020, Wells filed a complaint in the Circuit Court for Somerset County, Maryland against Governor Larry Hogan, Maryland General Assembly Speaker Adrienne A. Jones, University of Maryland College Park, the Maryland Higher Education Commission, the Office of the Secretary of the Maryland State Department of Education, University of Maryland Eastern Shore, the Maryland State Treasurer, the Maryland Department of Budget & Management Central Collections Unit, (collectively, the "State of Maryland"),[1] Heidi Anderson, Prince Attoh, Cheryl Duffy, Lakeisha Harris, Jason Casares, Joyce Bell, Marshall Stevenson, and Lorenzo Boyd, (collectively, the "UMES individual defendants" and, with the State of Maryland, the "state defendants"); the United Sates Attorney General and the United States Department of Education, Office for Civil Rights (collectively, the "federal defendants"); and the Middle States Commission on Higher Education. (ECF 2, Compl.).

Wells brought four counts against all defendants, each of which raise multiple claims. Count One appears to allege that UMES's grading and dismissal policies deprived her of due process and subjected her to discrimination on the basis of sex, gender, race, color, age, and nationality, primarily through the acts of Dr. Attoh, under the Civil Rights Act of 1866; the Civil Rights Act of 1964; the Age Discrimination Act of 1975; 42 U.S.C. §§ 1983, 1985, 1986; Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681–88; the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution; Article 24 and Article 26 of the Maryland Declaration of Rights; and Maryland Code. Ann., Crim. Law § 7-302. (*Id.* ¶ 4). Count Two alleges claims of fraud, unjust enrichment, conversion, and "improper access to a computer, system,

[1] Though Wells identifies Governor Hogan, Treasurer Nancy Kopp, Adrienne Jones, Wallace Loh, and Mark A. Shaymon in the Caption of the complaint, the court interprets these designations to refer to the respective offices of these State officers as Wells does not mention any of them in the body of the complaint and because the case caption also includes the offices along with the official's name (e.g., "STATE OF MARYLAND, Larry Hogan, Governor of MD").

network and scheme to defraud and illegal grade tampering and unauthorized grade changes." (*Id.* ¶ 29). Count Three alleges breach of contract and breach of the covenant of good faith and fair dealing. (*Id.* ¶ 40). Count Four alleges violations of the Maryland Consumer Protection Act and the Maryland Consumer Debt Collection Act. (*Id.*¶ 43). Wells demands compensatory and punitive damages in excess of $40 million and injunctive and declaratory relief. (*Id.* at 32–35).

The State of Maryland removed the case to this court on July 29, 2020, and the state defendants moved to dismiss the claims against them. (ECF 1; ECF 19). The federal defendants then filed a motion to dismiss for failure to state a claim and for lack of subject matter jurisdiction. (ECF 27). Thereafter Wells filed an "Amended and/or Supplemental Complaint or in the Alternative Response and Opposition to Defendants['] Motions," (ECF 34) which the court construes as a response in opposition to the motions to dismiss. The Middle States Commission on Higher Education then filed a motion to dismiss, (ECF 35), and Wells filed a motion for summary judgment and a motion pursuant to Fed. R. Civ. P. 56(d) to take discovery, (ECF 39; ECF 45). These matters have been fully briefed or the parties have had an opportunity to respond and they are ready for resolution.

## DISCUSSION

The court will first address Wells's motion to take discovery and will then turn to the several motions to dismiss and Wells's motion for summary judgment.

### I. Wells's Motion for Discovery

Wells contends that certain facts essential to her opposition to the defendants' motions to dismiss cannot be presented without discovery. Under the Local Rules of this court, "discovery shall not commence . . . until a scheduling order is entered" unless otherwise ordered by the court. L.R. 104.4 (D. Md. 2021). Federal Rule of Civil Procedure 56 permits a party to file a motion for

summary judgment, identifying each claim or defense or the part of each claim or defense on which summary judgment is sought, which may be opposed by the party against whom summary judgment is sought (the "nonmovant"). Fed. R. Civ. P. 56(a). Under Fed. R. Civ. P. 56(d):

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts to justify its opposition, the court may:
> (1) defer considering the motion or deny it;
> (2) allow time to obtain affidavits or declarations or to take discovery; or
> (3) issue any other appropriate order.

Here, the state defendants, the federal defendants, and the Middle States Commission of Higher Education have each filed a motion to dismiss Wells's complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.[2] They have not moved for summary judgment under Rule 56. The motion to dismiss does not reference any evidence outside of the complaint and its numerous exhibits, but instead challenges whether the complaint raises "a right to relief above the speculative level on the assumption that all the allegations in the complaint are true . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Discovery is not warranted to oppose these motions, which are directed only at the sufficiency of the complaint. Accordingly, Wells's motion for discovery will be denied.

## II. Motions to Dismiss

### a. Standard of Review

To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (internal citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements

[2] The federal defendants also have moved to dismiss the complaint for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1).

of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted). "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). Additionally, although courts "must view the facts alleged in the light most favorable to the plaintiff," they "will not accept 'legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments'" in deciding whether a case should survive a motion to dismiss. *U.S. ex rel. Nathan v. Takeda Pharm. North Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (quoting *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)). The court is mindful of its obligation to liberally construe self-represented pleadings, such as the instant complaint. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Nonetheless, liberal construction does not mean that this Court can ignore a clear failure in the pleading to allege facts which set forth a cognizable claim. *See Weller v. Dep't of Soc. Servs.*, 901 F.2d 387 (4th Cir. 1990); *see also Beaudett v. Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985) (stating a district court may not "conjure up questions never squarely presented").

As a general rule, the court does not consider extrinsic evidence at the motion to dismiss stage; however, it is a well-recognized exception to this rule that the court may consider, without converting the motion to dismiss into one for summary judgment, documents attached to the complaint as exhibits. *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (citing Fed. R. Civ. P. 10(c)). Where the complaint shows that the plaintiff has adopted the contents of the documents attached to the complaint, "crediting the document over conflicting allegations in the complaint is proper." *Id.* at 167.

**b. Middle States Commission on Higher Education's Motion and the Federal Defendants' Motion**

The Middle States Commission on Higher Education ("Commission") moves to dismiss Wells's claims against it on the grounds that she makes no plausible allegations of any acts or failures to act by the Commission.[3] The court agrees. The complaint contains a single allegation that the Commission "failed and willfully neglected to oversee UMES, all MD HBCU's and the entire University of Maryland facilities and institutions as to programs, policies, practices and procedures." This is a conclusory assertion devoid of "further factual enhancement," *Twombly*, 550 U.S. at 557, and is unconnected to any of the causes of action that Wells alleges. The court cannot plausibly conclude from this single statement that the Commission was involved in any of the conduct about which Wells complains. Accordingly, the court will grant the Commission's motion to dismiss.

For the same reason, the court will grant the federal defendants' motion to dismiss. Wells brings the same allegation against the federal defendants, stating they "failed and willfully neglected to oversee" University of Maryland institutions, but otherwise does not refer to the federal defendants whatsoever in her complaint. This singular conclusory allegation is insufficient to state a claim against the federal defendants.[4]

[3] As the court concludes that Wells's complaint fails to state a claim against the Commission, the court need not address the Commission's argument that Wells failed to properly serve it.

[4] As Wells's complaint fails to state a claim against the federal defendants, the court need not address their additional argument that Wells failed to identify a waiver of sovereign immunity allowing her to maintain suit against them.

**c. State Defendants' Motion**

As explained above, Wells's complaint alleges claims against numerous state entities and individual employees, which the state defendants have moved to dismiss. The court will address the claims against the state defendants in turn.

**i. Count One**

In Count One, Wells raises discrimination and due process claims concerning her grade in course 601 and her temporary dismissal from the Organizational Leadership Program under the Civil Rights Act of 1866, 42 U.S.C. § 1981; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; the Age Discrimination Act of 1975, 42 U.S.C. § 6102; 42 U.S.C. §§ 1983, 1985, and 1986; Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681–88; the Fifth and Fourteenth Amendments of the United States Constitution; and Article 24 of the Maryland Declaration of Rights. (ECF 2, Compl. ¶ 4).[5]

**1. Discrimination Claims**

Wells's discrimination claims appear to be based on two separate theories. First, Wells alleges that a combination of UMES policies and Dr. Attoh's conduct operated to exclude older African-American females from the Organizational Leadership program. Second, Wells alleges

[5] Wells additionally cites Maryland Code. Ann., Crim. Law § 7-302 as a basis for her discrimination and due process claims. Section 7-302 of the Maryland Code is a criminal statute which prohibits *inter alia* unauthorized access to computers—it does not provide a private cause of action for Wells at all, let alone one for discrimination or violation of her rights to due process. And to the extent Wells seeks to bring a claim under the Eighth Amendment, such a claim will be dismissed. The Eighth Amendment's protections against "excessive fines" and "cruel and unusual punishment," U.S. Const., amend. VIII, are not plausibly implicated by Wells's simple grading dispute with UMES. Similarly, Article 26 of the Maryland Declaration of Rights protects persons against warrantless searches and seizures and is clearly inapplicable to this case. Md. Const., Decl. of Rights, art. 26.

that UMES grading and dismissal policies disadvantage African-American students in comparison to the grading and dismissal policies of other UM institutions.

To state a claim under any of the various causes of action Wells asserts as a basis for her discrimination claims, she must adequately allege facts that indicate she was treated differently from other students on the basis of her sex, age, or race.[6] Her complaint fails to set forth such facts.

Wells claims that four alleged "components" of conduct operate to exclude African-American female students from the Organizational Leadership program: (1) the withholding of grades on assignments until the end of the course, without the opportunity to redo assignments; (2) Dr. Attoh refusing to give credit for assignments which were submitted; (3) the policy of immediate removal from the program upon receipt of a failing grade; and (4) requiring students to pay tuition accounts owed to UMES. (ECF 2, Compl. ¶ 9). Her allegations of a systematic method of exclusion fail to state a claim of discrimination for two reasons. First, the specific facts Wells includes in her complaint contradict the existence of at least two of the alleged components of discrimination. For example, she alleges that Dr. Attoh refused to give her credit for assignments

[6] *See Onawola v. Johns Hopkins Univ.*, 412 F. Supp. 2d 529, 533 (D. Md. 2006) (claim under 42 U.S.C. § 1981 must be dismissed "if the complaint fails to allege any facts that might support an inference that the defendant intentionally discriminated against plaintiff because of color or national origin"); *Thompson v. U.S. Dep't of Hous. & Urb. Dev.*, 348 F. Supp. 2d 398, 418 (D. Md. 2005) (liability under 42 U.S.C. § 2000d requires proof of intentional discrimination); *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (valid 42 U.S.C. § 1985 conspiracy claim requires proof of a conspiracy of two or more persons "motivated by a specific class-based, invidiously discriminatory animus" to deprive the plaintiff of her constitutional rights) (internal quotation marks omitted); 42 U.S.C. § 6102 (prohibiting discrimination "on the basis of age" in any program or activity receiving federal financial assistance); *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *cert. denied*, No. 20-1163, 2021 WL 2637992 (U.S. June 28, 2021) (Title IX claim requires a showing of exclusion from participation in an education program "on the basis of sex"); *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 108 (4th Cir. 2011) ("In order to survive a motion to dismiss an equal protection claim [under § 1983], a plaintiff must plead sufficient facts to demonstrate plausibly that [s]he was treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus.").

she submitted, yet emails which she cites between her and Dr. Attoh, attached to the complaint, reveal that for the two assignments for which she received no credit, her submissions were either late or not submitted at all. (*See* ECF 2-4, Ex. B at 2–5, 8–9, 34–36). Those same emails indicate that she received feedback and evaluations regarding her work throughout the course. (*Id.* at 8, 22, 28, 31). Second, there are no allegations in the complaint from which the court can infer that Dr. Attoh's alleged conduct or UMES policies differ from student to student, let alone on the basis of race, sex or age. Wells attempts to compare her treatment to those of other students only once—she alleges that when partnered for a group project with a "white male student who was younger" than her, she received a higher grade (19 out of 20 points) than she received for some of her individual assignments. (ECF 2, Compl. ¶ 15). But of the assignments Wells timely submitted, she largely received scores comparable to the one she received for the group project. She scored a 5/5 on her class presentation, an 8/10 on her reflection paper, a 5/10 on the "critique" paper (for which she admits she did not follow Dr. Attoh's rubric), and a 21/25 on her final exam. (ECF 2-4, Ex. B at 38; ECF 2, Compl. ¶¶ 12, 13, 17).[7]

Wells's claim that UMES grading and dismissal policies disadvantage African-American students in comparison to the grading and dismissal policies of other UM institutions is similarly unsupported by the facts alleged. She compares UMES policies to those of the University of Maryland University College Global Campus and University of Maryland College Park. (ECF 2, Compl. ¶¶ 28, 52–54). Even assuming that the policies at UMES differ from other UM institutions,

[7] Wells's inclusion of two pieces of correspondence from former students of the Organizational Leadership Program does not assist her claim. One student writes that Dr. Attoh unfairly graded her work as a "millennial" student, clearly a younger cohort than the one to which Wells belongs, and the student does not make allegations of racial or sex discrimination. (ECF 2-32, Ex. CC, Settles Ltr.). The other does not include the reason for her withdrawal from the program, but also references dismissals of "millennials." (ECF 2-33, Ex. DD, Walker Email).

she has not alleged that the apparently stricter UMES policies do not apply equally to students regardless of protected class status nor that they resulted in the dismissal of any student who was a member of a protected class, as the gravamen of Wells's complaint is that UMES officials failed to follow their own procedures in dismissing and reinstating her.

**2. Due Process Claims**

Wells contends that her rights to due process were violated when Dean Harris failed to follow UMES's own dismissal and appeal procedures by immediately dismissing Wells from the Organizational Leadership Program upon her receipt of a failing grade and then reinstating her without a hearing and in her own individual discretion. (ECF 2, Compl. ¶¶ 18–19). "To be entitled to the procedural protections of the Fourteenth Amendment" or Article 24 of the Maryland Declaration of Rights, Wells must present facts sufficient to allege that her dismissal and reinstatement "deprived her of either a liberty or a property interest." *Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 82 (1978) (internal quotation marks omitted); *Ellis v. McKenzie*, 457 Md. 323, 332 (2018) (equating Article 24 of the Maryland Declaration of Rights with the Due Process Clause of the Fourteenth Amendment). "For a property interest in a certain government benefit, a person must have more than an abstract need or desire for it. [She] must have more than a unilateral expectation of it. [She] must, instead, have a legitimate claim of entitlement to it." *Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 79 (4th Cir. 2016) (internal quotation marks omitted).

The United States Supreme Court has assumed, but not decided, that students have a protected property interest in continued enrollment in an institution. *See Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 222 (1985). The Fourth Circuit Court of Appeals has held that where a student does not meet the requirements of an academic program, she has no legitimate

claim of entitlement to "academic credit, graduation, certification, [or] prospective employment." *Kerr*, 824 F.3d at 80 (affirming dismissal of due process claim brought by a student in a teaching program whose masters degree was withheld after she failed to complete several student teaching requirements). *See also Nofsinger v. Virginia Commonwealth Univ.*, No. 3:12-CV-236, 2012 WL 2878608, at *6 (E.D. Va. July 13, 2012), aff'd, 523 F. App'x 204 (4th Cir. 2013) (holding student had no protected property interest in continued enrollment). And Wells provides no authority, and the court has found none, suggesting that students have a recognized property interest in a specific grade. *See, e.g.*, *Smith v. Utah Valley Univ.*, 97 F. Supp. 3d 998, 1004 (S.D. Ind. 2015); *Smith v. Davis*, 507 F. App'x 359, 362 (5th Cir. 2013); *Brown v. Clements*, No. 3:15CV104, 2015 WL 5677296, at *7 (E.D. Va. Sept. 23, 2015). Wells's entitlement, if there is any in this case, may be in continued enrollment in the Organizational Leadership Program, but not in receiving credit for course 601 nor in achieving a certain grade in the course.

Even assuming Wells plausibly has a protected interest in continued enrollment in the Organizational Leadership Program, her claim fails as the facts alleged, viewed in the light most favorable to her, demonstrate she was given due process.

In the context of a disciplinary dismissal or suspension of a student from an academic program, due process requires that the student "be given oral or written notice" of the reasons for the dismissal and, "an opportunity to present [her] side of the story." *Goss v. Lopez*, 419 U.S. 565, 581 (1975). This process need not take place through a "formal hearing at which [the student] could defend her academic ability and performance." *Horowitz*, 435 U.S. at 85. All that is required is an "informal-give-and take between the student and the administrative body dismissing [her] that would, at least, give the student the opportunity to characterize [her] conduct and put it in what [she] deems the proper context." *Id.* at 85–86 (internal quotation marks omitted). An academic

dismissal requires even less stringent procedural requirements—the Supreme Court has not required an adversarial hearing in such contexts. *Id.* at 90. *See also Brown v. Rectors & Visitors of Univ. of Virginia*, 361 F. App'x 531, 532–33 (4th Cir. 2010).

Applying these principles to Wells's case, it is clear she was afforded adequate process. Dr. Attoh provided Wells with notice of her failing grade and the reasons for her dismissal, citing the UMES graduate catalog. (ECF 2-4, Ex. B at 38; ECF 2-11, Ex. I, Excerpt of UMES Graduate Catalog at 3). And Wells was given an opportunity to contest the dismissal through the UMES appeals process, which she successfully did. It is immaterial whether Dr. Harris or any other UMES official followed the appeals process to the letter. Even the more stringent procedural requirements for disciplinary dismissal require only a notice and opportunity to be heard, *see Horowitz*, 435 U.S. at 85–86. Wells has received both.

***

Accordingly, the court will dismiss the claims in Count One against the state defendants.

**ii. Count Two**

Wells alleges claims against the state defendants for fraud, unjust enrichment, conversion, and "improper access to a computer, system, network and scheme to defraud and illegal grade tampering and unauthorized grade changes." (ECF 2, Compl. at 23). These claims appear to be based on Wells's allegation that "Defendants known and unknown" changed her grade for course 601 from an "F" to a "W," though she "has never submitted any withdrawal letter to any of the Defendants at UMES." (*Id.* ¶ 29).

A claim for fraud requires Wells to show that: (1) the state defendants made a false representation to her (2) that was either known to them to be false or was made with reckless indifference as to its truth (3) for the purpose of defrauding Wells, (4) and that Wells reasonably

relied on the misrepresentation and (5) suffered injury as a result. *See Hoffman v. Stamper*, 385 Md. 1, 28 (2005). A claim for conversion requires her to show that the state defendants wrongfully deprived her of possession of property to which she is entitled, and they intended to exercise dominion and control over the property. *See Yuan v. Johns Hopkins Univ.*, 452 Md. 436, 463 (2017). And a claim for unjust enrichment requires Wells to show: (1) a benefit conferred upon the defendants by Wells; (2) an appreciation or knowledge by the defendants of the benefit; and (3) acceptance or retention by the defendants of the benefit without the payment of its value. *See Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 295 (2007).

The relationship between these claims and the facts alleged is far from apparent. Wells has not demonstrated how a grade change is a false representation to her and does not make any allegations that she relied to her detriment on the grade change. She does not identify what property she has been deprived of, and even assuming that she means to allege the state defendants have wrongfully deprived her of her "F" grade, as explained previously, Wells has no property interest in a specific grade. *See Kerr*, 824 F.3d at 80; *Smith*, 97 F. Supp. 3d at 1004. And the complaint contains no allegations that she conferred any benefit whatsoever on the state defendants.

As for Wells's claims of "improper access to a computer, system, network and scheme to defraud and illegal grade tampering and unauthorized grade changes," to the extent she seeks to bring a claim under Maryland Code. Ann., Crim. Law § 7-302 (Unauthorized access to computers and related material), the claim fails as it is based on a criminal statute that does not provide a private cause of action. Wells does not identify any other independent cause of action for "illegal grade tampering and unauthorized grade changes."

Accordingly, Wells's Count Two will be dismissed as to the state defendants.

**iii. Count Three**

Wells alleges that "the parties were in a contractual relationship with UMES and all Defendants and ALL Defendants by whatever names owed a duty to Plaintiff Wells to act in good faith and deal fairly with her." (ECF 2, Compl. ¶ 41). These contract claims against the State of Maryland are barred by sovereign immunity. The Maryland legislature has waived sovereign immunity for contract claims only where the claim is "based on a written contract that an official or employee executed for the State or one of its units while the official or employee was acting within the scope of the authority of the official or employee." Md. Code Ann., State Gov't § 12-201(a). Wells has failed to identify any written contract signed by an authorized UMES official in this case.[8]

As for the remaining UMES individual defendants, Wells's conclusory assertion that a contract existed between them and her, without any explanation of the circumstances under which the contract was formed or the content of its terms, is insufficient to state a breach of contract claim. "Maryland law requires that a plaintiff alleging a breach of contract must of necessity allege with certainty and definiteness *facts* showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant." *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 362 (2012) (internal quotation marks and citation omitted) (emphasis in original).

Accordingly, Wells's contract claims will be dismissed as to the state defendants.

[8] Even if Wells could identify such a contract, her claims would be untimely and subject to dismissal, as any contract claims for which the state has waived sovereign immunity must be filed within one year after the later of "(1) the date on which the claim arose; or (2) the completion of the contract that gives rise to the claim." Md. Code Ann., State Gov't § 12-202. Wells filed her complaint on June 23, 2020, more than one year following her October 4, 2018, dismissal from the Organizational Leadership Program. (Wells does not identify what acts constitute a breach of contract, but given the complaint's focus on her dismissal, the court assumes the dismissal to be the source of any breach and also the date on which any contract claim might arise.)

**iv. Count Four**

Wells alleges that the state defendants violated the Maryland Consumer Protection Act ("MCPA") and the Maryland Consumer Debt Collection Act ("MCDCA") by attempting to collect a tuition debt Wells does not owe and by attempting to collect such debt without a license (ECF 2, Compl. ¶¶ 43–50). The state defendants argue that this count should be dismissed because neither the MCPA nor the MCDCA applies to the State of Maryland.

The MCPA prohibits a "person," defined as "an individual, corporation, business trust, statutory trust, estate, trust, partnership, association, two or more persons having a joint or common interest, or any other legal or commercial entity," Md. Code Ann., Com. Law § 13-101(h), from engaging in any unfair, abusive, or deceptive trade practices, including in the collection of consumer debts, *id.* § 13-303(5). In *Benson v. State*, the Maryland Court of Appeals held that the MCPA does not regulate state conduct. 389 Md. 615, 651 (2005). The court cited the legal principle adopted in *Lomax v. Comptroller,* 323 Md. 419 (1991) that, "when construing a statute whose language is written in general terms that are reasonably susceptible to being construed as applicable to the conduct of both governmental and private parties, the rule of construction to be applied is to exclude the government from the statute's operation unless the Legislature provides particular indication in the language that it intended to include the State in its sweep." *Benson*, 389 Md. at 648 (citing *Lomax*, 323 Md. at 421–22). Applying this principle to the MCPA, the court found that the statute did not declare it explicitly applied to the state, did not include the state in its definition of a "person," and gave to the state the role of investigator, enforcement officer, and adjudicator of violations of the statute, signaling that the legislature did not intend to include the state as a person covered by the Act. *Id.* at 649–51.

The MCDCA prohibits a person collecting or attempting to collect an alleged debt arising out of a consumer transaction from certain acts in an attempt to collect a debt, including engaging in unlicensed debt collection activity. Md. Code. Ann., Com. Law §§ 14-201(b)–(d), 14-202(10). "Person" is defined in an identical manner as in the MCPA. *See id.* § 14-201(d). Given that, like the MCPA, the definition of a person under the MCDCA does not include the State, the court sees no reason why the logic of *Benson* would not apply equally to the MCDCA. There is no "manifest intent in the language of the statute" that suggests state debt collection activity is to be regulated by it. *Benson*, 389 Md. at 651.

Accordingly, because Wells cannot maintain a cause of action against the state or its agencies for violations of the MCPA or the MCDCA, Count Four of the complaint will be dismissed as to the State of Maryland defendants and the remaining UMES individual defendants in their official capacities. As Wells does not allege that any of the remaining UMES individual defendants engaged in an action to collect an alleged debt outside of their official duties, any MCPA or MCDCA claim asserted against them in their personal capacities also will be dismissed.

***

In sum, Wells's complaint does not state any claims upon which relief may be granted. For this reason, Wells's motion for summary judgment also must fail.

**CONCLUSION**

For the reasons stated herein, the court will grant the motions to dismiss and deny Wells's motions for summary judgment and to take discovery. A separate Order follows.

8/18/2021
Date

/S/
Catherine C. Blake
United States District Judge